STATE OF MINNESOTA

IN SUPREME COURT

A21-1642
A23-0628

Washington County                                        Procaccini, J.
                                                   Took no part, Hennesy, J.

State of Minnesota,

                 Respondent,

vs.                                                  Filed:  June 12, 2024
                                             Office of Appellate Courts

Angel Ignacio Sardina-Padilla,

                 Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Kevin M. Magnuson, Washington County Attorney, Nicholas A. Hydukovich, Assistant County Attorney, Stillwater, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Barts, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.    The district court did not commit reversible error when it concluded that an application for a warrant to search appellant's Facebook accounts provided the issuing

judge with a substantial basis for determining that there was a fair probability that evidence of the alleged crimes would be found on those accounts.

2. Given the circumstances of the case, the nature of the crimes under investigation, and the difficulty of articulating a more precise description of the evidence sought, the district court did not commit reversible error when it determined that the warrant satisfied minimal constitutional requirements for particularity.

3. The district court did not abuse its discretion by summarily denying appellant's petition for postconviction relief.

Affirmed.

O P I N I O N

PROCACCINI, Justice.

Appellant Angel Ignacio Sardina-Padilla appeals from the district court's final judgment of conviction of first-degree premeditated murder and its summary denial of his petition for postconviction relief. Following a jury trial, Sardina-Padilla was convicted of first-degree premeditated murder for the death of Jose Genis Cuate. Sardina-Padilla filed a direct appeal, which we stayed to allow him to pursue postconviction relief. In his petition for postconviction relief, Sardina-Padilla alleged ineffective assistance of trial counsel. The district court summarily denied his petition, and we consolidated his appeals.

In this consolidated appeal, Sardina-Padilla first claims that the district court committed reversible error by denying his motion to suppress evidence obtained pursuant to a June 2019 warrant to search his Facebook accounts. He argues that the warrant application failed to establish probable cause because it did not contain information

2

sufficient to create a nexus between the evidence sought and the place to be searched. Second, he claims that the June 2019 warrant failed to satisfy minimal constitutional requirements for particularity. Third, he argues that the district court abused its discretion by summarily denying his postconviction petition, which alleged that he received ineffective assistance of counsel because his trial counsel did not challenge location information obtained pursuant to a May 2019 tracking warrant. Because the district court did not commit reversible error, we affirm.

**FACTS**

On June 2, 2019, a passing motorist discovered Genis Cuate's body lying just off a dirt road in rural Washington County. The body was wrapped in a blanket, with a belt around the neck. The medical examiner observed lacerations to Genis Cuate's face and head consistent with blunt force injuries, concluding that the cause of death was ligature strangulation and that the manner of death was homicide. Investigators later determined that Genis Cuate had died on May 24 or 25, 2019.

Evidence obtained from two warrants related to Sardina-Padilla's alleged participation in *other* crimes implicated him in Genis Cuate's murder.

The first warrant was issued on May 13, 2019—about two weeks before the murder—and authorized law enforcement to track Sardina-Padilla's location through his Facebook account (the May warrant). The May warrant application was part of a Hennepin County investigation, and it alleged that Sardina-Padilla was linked to a violent street gang called Sureños 13. The application also alleged that, according to a confidential informant, Sardina-Padilla was "currently selling methamphetamine." Tracking data obtained

3

pursuant to the May warrant showed that Sardina-Padilla was in Minneapolis on the evening of May 24, 2019, and, in the early hours of the next day, was near the dirt road where Genis Cuate's body was found in rural Washington County.

The second warrant arose from a separate investigation into the kidnapping and attempted murder of another individual, L.H. A week after the motorist discovered Genis Cuate's body, on June 9, 2019, a different motorist found L.H., shot in the chest and left for dead, on a rural Washington County road. L.H. survived and, during an interview with police officers, explained that Sardina-Padilla and a man named Luis Cortez Mendoza— both gang members—had kidnapped her from her home over an alleged debt, intending to "make an example of her." Cortez Mendoza later admitted that he shot L.H., allegedly at Sardina-Padilla's direction.

On June 18, 2019, police officers arrested Sardina-Padilla in connection with the kidnapping and attempted murder of L.H. During a jail call, Sardina-Padilla had a conversation that—according to the subsequent warrant application—"referred to erasing his Facebook accounts."

Officers investigating L.H.'s kidnapping and attempted murder applied for a warrant to search two Facebook accounts associated with Sardina-Padilla for "[a]ll content" from April 1, 2019, through June 24, 2019. The warrant application described the events before L.H.'s shooting as follows: Sardina-Padilla and Cortez Mendoza had a confrontation with L.H. and others at L.H.'s home over a stolen pistol. This confrontation culminated in Sardina-Padilla and Cortez Mendoza burning people with a heated crowbar to obtain information. The two men then told L.H. to get into a car so that they could

4

"make an example of her." In the car, the men took out guns, and Sardina-Padilla showed L.H. a video of him torturing people with his "brothers." Later that day, Cortez Mendoza drove L.H. to rural Washington County and shot her at Sardina-Padilla's direction. The warrant application also explicitly referred to Facebook as a relevant source of information for investigators, listing pertinent Facebook accounts and then stating:

> Your affiant was informed there was communication between [a third party] and [L.H.] referencing money owed by [L.H.] to [Sardina-Padilla] for buying a gun. Additionally, there were numerous photos on these pages showing association to each other. The account information may also provide login IP information which could tend to show location information and be used to corroborate [L.H.]'s account of events. Also, after [Sardina-Padilla] was arrested, he took part in recorded jail calls w[h]ere the conversation referred to erasing his Facebook accounts. It should be noted that the accounts identified above all had preservation letters sent to Facebook to ensure the content would be available to law enforcement when a search warrant could be obtained.

The warrant application sought "permission to obtain the requested Facebook records as they may be evidence of the crimes of kidnapping and attempted murder." The warrant issued on June 25, 2019 (the June warrant), authorizing a search of "[a]ll content" associated with Sardina-Padilla's Facebook accounts from April 1, 2019 through June 24, 2019, as requested.

Although the May and June warrants were based on Sardina-Padilla's alleged participation in other crimes, evidence obtained from these warrants implicated Sardina-Padilla in Genis Cuate's murder. The location information obtained pursuant to the May warrant placed Sardina-Padilla, on the night in question, at the alleged scene of Genis Cuate's murder and near where Genis Cuate's body was found. And Facebook content obtained pursuant to the June warrant incriminated Sardina-Padilla in Genis

5

Cuate's murder, revealing messages that Sardina-Padilla sent to Cortez Mendoza and others about the crime.

On February 28, 2020, following a months-long investigation, a Washington County grand jury indicted Sardina-Padilla for first-degree premediated murder in connection with Genis Cuate's death. His trial counsel moved to dismiss the Washington County indictment. Trial counsel also moved to suppress the evidence obtained via the June warrant to search Sardina-Padilla's Facebook accounts on two grounds. First, trial counsel argued that the facts alleged in the application for the June warrant failed to establish probable cause because they did not provide a substantial basis to conclude that there was a fair probability that evidence related to the kidnapping and attempted murder of L.H. would be found on the Facebook accounts. Second, trial counsel argued that the June warrant failed to satisfy minimal constitutional requirements for particularity because it authorized a search of "all content" on the Facebook accounts for a period of almost three months. Trial counsel did not challenge the tracking information obtained pursuant to the May warrant, which was issued in the unrelated controlled-substance investigation in Hennepin County.[1]

The district court denied Sardina-Padilla's motion to suppress the evidence obtained from the June warrant. As to probable cause, the court determined that the totality of the circumstances described in the June warrant application suggested that the accounts "likely contained relevant evidence." Specifically, the court reasoned that the allegations that L.H.

---

[1]     As discussed further below, Sardina-Padilla later claimed that trial counsel's failure to challenge this evidence constituted ineffective assistance of counsel.

6

communicated via Facebook with a third party about money she owed Sardina-Padilla for a gun, that persons of interest in the case were associated through Facebook, and that Sardina-Padilla asked his girlfriend to delete his Facebook account during a jail call,[2] all indicated that the Facebook accounts would contain evidence relevant to the kidnapping and attempted murder of L.H.

As to particularity, the district court stated that although the warrant's authorization of a search for "[a]ll content" on the accounts, without any limitation, would have "clearly" been "impermissible," the June warrant included a temporal limitation, authorizing a search for only three months of content. Consequently, the court concluded that the June warrant satisfied minimal constitutional requirements for particularity.

At Sardina-Padilla's jury trial, Cortez Mendoza testified about the events before and after Genis Cuate's murder. Facebook messages obtained through the June warrant corroborated Cortez Mendoza's testimony, which is summarized below.

On May 24, 2019, Sardina-Padilla messaged Cortez Mendoza to bring meth to a house in Minneapolis. The house was later determined to be Genis Cuate's residence. Cortez Mendoza arrived just before midnight and saw four people using meth in the living room. He also saw Sardina-Padilla through the open door of a bedroom, beating a man who Cortez Mendoza did not know. The man had his hands in front of his face, yelling

---

[2]    As discussed below, the district court's order denying Sardina-Padilla's motion to suppress drew some reasonable inferences from the warrant application. The district court also made a factual finding not supported by the application by referring to Sardina-Padilla's girlfriend, but that error was immaterial to the determination that the warrant was supported by probable cause.

"kill me now you f\*\*\*er," but could not stop the blows. Sardina-Padilla then closed the door. Eventually, Sardina-Padilla came out of the bedroom and told Cortez Mendoza to park a car in the alley behind the house.

Cortez Mendoza had messaged his friend K.H. earlier in the evening about using meth together. She came to the Minneapolis house, and they used meth in her car. Cortez Mendoza asked to borrow her car so that his "brother" could move furniture. K.H. agreed and Cortez Mendoza parked her car in the alley behind the house. Eventually, Cortez Mendoza went inside to give Sardina-Padilla the keys to K.H.'s car. At the time, Sardina-Padilla was angry because he had messaged Cortez Mendoza, asking where he was, and received no response.

Cortez Mendoza went back outside and sat in his vehicle with K.H., before going to the alley to speak with Sardina-Padilla. Just inside the back door, he saw Sardina-Padilla dragging a body down the steps. The body was wrapped in a blanket. Sardina-Padilla put the body in the trunk of K.H.'s car and drove away. Cortez Mendoza returned to his vehicle to sit with K.H.

Cortez Mendoza messaged Sardina-Padilla to ask where he went. After trying to contact Sardina-Padilla throughout the night, Cortez Mendoza finally heard from him in the late morning on May 25, 2019. Eventually, they met at the Minneapolis house, and Cortez Mendoza got K.H.'s keys.

K.H. testified at trial and corroborated portions of Cortez Mendoza's account. According to K.H., she and Cortez Mendoza spent that night together, driving around and

8

using meth in his vehicle. She confirmed that she loaned him her car so that his "brother" could move furniture and that she did not get it back until the next morning.

Another witness, J.M., also testified at trial and further corroborated Sardina-Padilla's involvement in Genis Cuate's murder. She told the jury that she considered Sardina-Padilla like a "brother." On May 25, 2019, within a day of the murder, Sardina-Padilla told her that he had killed someone. Although she at first thought he was joking, Sardina-Padilla showed her a video of someone with his distinctive wrist tattoo strangling a man with a belt (the Facebook video). The Facebook video, enhanced for clarity by the Bureau of Criminal Apprehension, shows Genis Cuate's face, seemingly lifeless, with a belt wrapped around his neck. He wears a black tank top, like the one his body was found in. The lower half of his body is wrapped in a blanket, and the background matches the bedroom in his residence. Although Sardina-Padilla's face is not in the video, the belt is held by an arm with a distinctive tattoo that matches the tattoo on his right wrist. In the video, a male voice seemingly says: "See, see this guy, cop caller, for all you snitches, b**** a** n*****, all will suffer the same, all that s***, see, look at this s***."

Facebook messages discovered during the execution of the June warrant also corroborated Cortez Mendoza's account. These include messages between Sardina-Padilla and Cortez Mendoza from the night of the murder. In these messages, Sardina-Padilla asks whether Cortez Mendoza has any rope, Sardina-Padilla asks Cortez Mendoza to enter the Minneapolis house, Cortez Mendoza responds that he is waiting for someone—presumably K.H.—to arrive, Sardina-Padilla orders Cortez Mendoza to bring drugs inside, and Cortez Mendoza states that he is moving the car. Sardina-Padilla also sent Cortez Mendoza a

9

message stating that he needed "to get him out of here." And after Sardina-Padilla drove away, Cortez Mendoza messaged him to ask where he went. On June 6, 2019, about 12 days after the murder, Sardina-Padilla sent Cortez Mendoza a news article about the discovery of Genis Cuate's body.

Sardina-Padilla also sent incriminating Facebook messages to others. For example, on May 25, 2019, Sardina-Padilla shared the Facebook video three times. The case's lead investigator testified that Sardina-Padilla had—in 18 instances—shared the article about the discovery of Genis Cuate's body. Around 3 a.m. on May 25, 2019, the night of the murder, Sardina-Padilla messaged someone, "I gotta tie this n**** up n dump him off in a ditch." Later that day, Sardina-Padilla messaged someone else, "last night I did a job again." On May 26, 2019, Sardina-Padilla messaged another person, "I done did bad some." On June 6, 2019, Sardina-Padilla sent the article about Genis Cuate's body being found to an associate. The recipient asked, "who is that," and Sardina-Padilla replied, "the guy who I took down." On June 7, 2019, Sardina-Padilla messaged someone that he had "charges for . . . murder coming up." On June 18, 2019, Sardina-Padilla messaged someone about needing to get out of Minnesota, and that person offered to let Sardina-Padilla use his identification.

The location information obtained pursuant to the May warrant also corroborated Cortez Mendoza's testimony because it showed that at around 11 p.m. on May 24, 2019, and 3 a.m. on May 25, 2019, Sardina-Padilla was at the Minneapolis house where the murder allegedly occurred. About three hours later, Sardina-Padilla was in rural

10

Washington County, a mile-and-a-half north of where Genis Cuate's body was found. At around 9 a.m. on May 25, 2019, he was back at the Minneapolis house.

A search of K.H.'s car, which Sardina-Padilla allegedly used to transport Genis Cuate's body, produced DNA evidence relevant to the investigation. Investigators discovered red discoloration, a roll of gray duct tape, and a broken zip tie in the car's spare tire compartment. The red discoloration tested positive for the presence of blood that matched Genis Cuate's DNA profile. Investigators also found a blood stain on the duct tape that matched Genis Cuate's DNA profile.

The medical examiner testified as to Genis Cuate's cause and manner of death. The examiner stated that Genis Cuate's body had a black leather belt, acting as a sliding ligature,[3] wrapped around the neck. The examiner concluded that Genis Cuate's cause of death was asphyxiated ligature strangulation. The strangulation caused petechial hemorrhaging, fractured Genis Cuate's thyroid cartilage, and left a ligature abrasion furrow around his neck. Although the examiner was unwilling to state precisely how long it would have taken for Genis Cuate to die by this cause, his testimony indicated that a victim of ligature strangulation—like Genis Cuate—would first fall unconscious before dying. This implies that the strangulation continued after Genis Cuate fell unconscious.

The jury found Sardina-Padilla guilty of first-degree premeditated murder. *See* Minn. Stat. § 609.185(a)(1) (2022). The district court sentenced Sardina-Padilla to the

---

[3]     A ligature is a "cord, wire, or bandage used for tying or binding." *The American Heritage Dictionary* 1015 (5th ed. 2011).

mandatory sentence of life imprisonment without the possibility of release. *See* Minn. Stat. § 609.106, subd. 2(1) (2022).

Sardina-Padilla filed a direct appeal, which we stayed to allow him to pursue postconviction relief. In his postconviction petition, Sardina-Padilla alleged that his trial attorneys provided ineffective assistance of counsel by failing to challenge the location evidence obtained pursuant to the May warrant. The district court summarily denied the petition without an evidentiary hearing, concluding that even if the location data had been suppressed, "there is little—if any—likelihood that the outcome of the trial would have been different." The court also acknowledged that there were reasonable, strategic explanations for Sardina-Padilla's counsel not to challenge the May warrant, "none of which fall below the constitutional standard of reasonableness."

Sardina-Padilla appealed the summary denial of his petition for postconviction relief, and we consolidated his appeals.

**ANALYSIS**

We begin by addressing Sardina-Padilla's two challenges to the denial of his motion to suppress evidence obtained pursuant to the June warrant to search his Facebook accounts. First, we address whether the June warrant was supported by probable cause. Second, we consider whether the June warrant satisfied minimal constitutional requirements for particularity. We then address whether the district court abused its discretion by summarily denying Sardina-Padilla's petition for postconviction relief, which is based on his claim that he received ineffective assistance of counsel because his trial counsel did not challenge evidence obtained pursuant to the May warrant.

12

We start with Sardina-Padilla's claim that the district court erred when it concluded that the allegations in the June warrant application provided the issuing judge a substantial basis to determine there was a fair probability that evidence of the crimes described in the warrant application—L.H.'s kidnapping and attempted murder—would be found on his Facebook accounts.

"When reviewing a pretrial order denying a motion to suppress, we review the district court's factual findings for clear error and its legal determinations de novo." *State v. Ezeka*, 946 N.W.2d 393, 403 (Minn. 2020). "A factual finding is clearly erroneous if it does not have evidentiary support in the record or if it was induced by an erroneous view of the law." *State v. Roberts*, 876 N.W.2d 863, 868 (Minn. 2016).

When a defendant's pretrial motion claims that the facts alleged in a search warrant application failed to establish probable cause, our review is limited to the information presented in the application, and the reasonable inferences that can be drawn from that information. *State v. Holland*, 865 N.W.2d 666, 673 (Minn. 2015); *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (noting that magistrates have the authority "to draw such reasonable inferences as [they] will from the material supplied to [them] by applicants for a warrant"). Based on that information, we ask only whether the issuing judge had a "substantial basis" for concluding that probable cause existed. *State v. Yarbrough*, 841 N.W.2d 619, 622 (Minn. 2014). We afford the issuing judge great deference, "recognizing that doubtful or marginal cases should be largely determined by the

preference to be accorded to warrants." *State v. Fawcett*, 884 N.W.2d 380, 385 (Minn. 2016) (citation omitted) (internal quotation marks omitted).

"A warrant is supported by probable cause if, on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Holland*, 865 N.W.2d at 673 (citation omitted) (internal quotation marks omitted). In other words, there must be a sufficient "nexus" between the evidence sought and the place to be searched. *Yarbrough*, 841 N.W.2d at 622. This nexus "may be inferred from the totality of the circumstances." *Id.* Under our substantial-basis review, we consider "the type of crime, the nature of the items sought, the extent of the suspect's opportunity for concealment, and the normal inferences as to where the suspect would keep the items." *State v. Pierce*, 358 N.W.2d 672, 673 (Minn. 1984).

The June warrant application to search Sardina-Padilla's accounts referred to Facebook several times. L.H., for example, identified Sardina-Padilla and Cortez Mendoza through Facebook photos. The application stated that the suspects and victim were associated through Facebook, that L.H. and a third party communicated about money that L.H. owed Sardina-Padilla, and that, following his arrest for his crimes against L.H., Sardina-Padilla discussed deleting his Facebook accounts during a jail call. These allegations stem largely from the following paragraph in the warrant application, which immediately followed a list of Facebook accounts identified by investigators:

> Your affiant was informed there was communication between [a third party] and [L.H.] referencing money owed by [L.H.] to [Sardina-Padilla] for buying a gun. Additionally, there were numerous photos on these pages showing association to each other. The account information may also provide login IP information which could tend to show location information and be used

14

to corroborate [L.H.]'s account of events. Also, after [Sardina-Padilla] was arrested, he took part in recorded jail calls w[h]ere the conversation referred to erasing his Facebook accounts. It should be noted that the accounts identified above all had preservation letters sent to Facebook to ensure the content would be available to law enforcement when a search warrant could be obtained.

In denying Sardina-Padilla's motion to suppress, the district court relied on the following allegations in the warrant application: that L.H. and a third party communicated about money that L.H. owed Sardina-Padilla over Facebook; and that Sardina-Padilla asked his girlfriend to delete his Facebook accounts. Sardina-Padilla contends that the district court's findings were clearly erroneous because the warrant application did not state (1) that the communications regarding the money owed *occurred on Facebook*; (2) that he *asked* someone to delete his Facebook account; or (3) that he was speaking with *his girlfriend* during the jail call.

We reject Sardina-Padilla's first argument because the facts alleged in the warrant application support a reasonable inference that the communications between L.H. and the third party about the money owed occurred via Facebook. As noted above, the clause about the communication immediately followed a list of Facebook account information, including that of L.H. and the third party. The clause was also immediately followed by a sentence that more explicitly referred to the Facebook accounts' contents: "Additionally, there were numerous photos on *these pages* showing association to each other." (Emphasis added.)

Sardina-Padilla's second argument is similarly unpersuasive, as the facts alleged in the warrant application support a reasonable inference that Sardina-Padilla asked someone

15

to delete his accounts. The warrant application stated that the jail calls occurred after Sardina-Padilla's arrest for kidnapping and attempted murder. It is reasonable to infer from this fact, and the allegation that Sardina-Padilla engaged in jail calls "w[h]ere the conversation referred to erasing his Facebook accounts," that he was asking someone to delete his accounts, rather than engaging in an abstract discussion about doing so.

As for Sardina-Padilla's third argument, we agree that neither the facts alleged in the warrant application nor any reasonable inferences drawn from those facts support the district court's finding that the warrant application alleged that Sardina-Padilla was speaking with his *girlfriend* during that jail call. But this erroneous finding about the identity of the person with whom he was speaking was not material to the district court's analysis. That Sardina-Padilla discussed deleting his Facebook accounts with *someone* during a jail call—in addition to the other allegations in the application—supported probable cause, regardless of who that person was. *Cf. State v. Harris*, 589 N.W.2d 782, 790–91 (Minn. 1999) (stating that certain allegations in a warrant affidavit lacked context to establish their relevance, raising "a genuine concern" that they were "stale or simply irrelevant," but that other factual allegations were sufficient to establish probable cause); *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010) (holding that a warrant application established probable cause supporting the warrant's issuance, as alleged omissions were not material to the probable-cause determination; in other words, including the "omissions would have no impact on the probable cause determination").

In sum, the district court did not clearly err in finding that the warrant application alleged that L.H. and the third party communicated over Facebook, and that Sardina-Padilla

16

asked someone to delete his Facebook account during a jail call. To the extent that the district court clearly erred in finding that the jail call occurred between Sardina-Padilla and his girlfriend, that finding was immaterial to the probable-cause determination.

After considering the facts alleged in the warrant application, the district court concluded that they provided the issuing judge a substantial basis to determine that there was a fair probability that evidence of L.H.'s kidnapping and attempted murder would be found on Sardina-Padilla's Facebook accounts. According to Sardina-Padilla, the district court erred because the warrant application failed to establish a sufficient nexus between the crimes alleged and the contents of his Facebook accounts. We disagree.

The June search warrant application provided a substantial basis to conclude that probable cause existed, and it contained sufficient information to show a nexus between the alleged criminal activity and Sardina-Padilla's accounts. The application established that a crime had been committed by describing witness accounts of Sardina-Padilla and Cortez Mendoza burning people with a crowbar to get information about a stolen pistol, taking L.H. from her residence to "make an example of her," and conspiring to shoot her. The application connected Sardina-Padilla to the crime by stating that L.H. identified him through Facebook photos.

Most importantly, the application connected the Facebook accounts to the alleged crimes by stating that, after his arrest, Sardina-Padilla participated in a jail call "w[h]ere the conversation referred to erasing his Facebook accounts." *See United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015) (concluding that there was a sufficient nexus between the crime alleged (drug smuggling) and the place to be searched (the defendant's Facebook

17

account) because the defendant called her cousin from jail shortly after her arrest and asked her cousin to delete content from her account); *see also State v. McTague*, 252 N.W. 446, 448 (Minn. 1934) (stating that it is "universally" acknowledged that "an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt" (citation omitted) (internal quotation marks omitted)); *State v. Taylor*, 869 N.W.2d 1, 22 (Minn. 2015) (holding that the admission of a jail call in which the defendant stated that he wished he had posted bail so that he could be "on the run" was not error because it suggested a consciousness of guilt). It was reasonable for the district court to infer that Sardina-Padilla discussed erasing his Facebook accounts shortly after his arrest because he was concerned about law enforcement finding incriminating evidence on those accounts.

The issuing judge had a substantial basis to determine that there was a fair probability that evidence of L.H.'s kidnapping and attempted murder would be found on Sardina-Padilla's Facebook accounts. As a result, the district court did not commit reversible error when it rejected Sardina-Padilla's argument that the June warrant application failed to establish probable cause.

## II.

We next consider Sardina-Padilla's claim that the district court committed reversible error when it determined that the June warrant satisfied minimal constitutional requirements for particularity.

The United States and Minnesota Constitutions require that a search warrant describe the evidence to be seized with particularity. U.S. Const. amend. IV; Minn. Const.

18

art. I, § 10. "This requirement prohibits law enforcement from engaging in general or exploratory searches." *State v. Bradford*, 618 N.W.2d 782, 795 (Minn. 2000); *see also State v. Hannuksela*, 452 N.W.2d 668, 672 (Minn. 1990) (noting that the prohibition against general warrants is intended to prevent "exploratory rummaging through a person's belongings"). When determining whether a clause in a search warrant is sufficiently particular, "the circumstances of the case must be considered, as well as the nature of the crime under investigation and whether a more precise description is possible under the circumstances." *State v. Miller*, 666 N.W.2d 703, 713 (Minn. 2003). Because these determinations are often fact specific, we afford "a degree of flexibility to the particularity requirement." *State v. Poole*, 499 N.W.2d 31, 34 (Minn. 1993).

We have not addressed whether a warrant authorizing a search of all content on a social media account for a limited time period meets minimal constitutional requirements for particularity. But we recognize that general searches of electronic data threaten individual privacy. *See In re B.H.*, 946 N.W.2d 860, 869 (Minn. 2020) (noting "the privacy concerns associated with cell phone data," which can track a person's location and "hold for many Americans the privacies of life," and counseling district courts to carefully examine subpoenas seeking such data (citation omitted) (internal quotation marks omitted)); *State v. McNeilly*, ___ N.W.3d ___, No. A22-0468, 2024 WL 2043477 (Minn. May 8, 2024) (concluding that a warrant to search a computer did not authorize an unlimited search); *see also United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) ("A general search of electronic data is an especially potent threat to privacy because hard drives and e-mail accounts may be 'akin to a residence in terms of the scope and quantity

19

of private information [they] may contain.' " (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (alteration in original))), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). And we appreciate that this risk to individual privacy extends to general searches of social media accounts, which often, and increasingly, contain extensive amounts of private information on the personal lives, social connections, and professional networks of account holders.

We also recognize that tailored searches of social media accounts are possible in some circumstances. Social media companies can send specific content and data to law enforcement agencies. *See United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) ("[W]hen it comes to Facebook account searches, the government need only send a request with the specific data sought and Facebook will respond with precisely that data."). Given the troves of private information potentially available on an individual's social media account, and a provider's ability to cull selected data from that information, law enforcement officers should tailor their searches to the contours of their investigation whenever possible.

In denying Sardina-Padilla's motion to suppress, the district court acknowledged that the June warrant "came perilously close to violating the requirement of particularity" and that the portion of the warrant authorizing law enforcement to search "[a]ll content" associated with Sardina-Padilla's Facebook accounts—standing on its own—would be "clearly impermissible." Despite these misgivings, the district court discerned no constitutional violation because the warrant contained a temporal limitation and the

"requirement of specificity is not rigid or absolute." We agree with the district court's concerns and its ultimate conclusion.

A warrant permitting a broad search can be sufficiently particular if greater specificity is not possible because officers do not know all the circumstances surrounding the alleged crime. For example, in *Hannuksela*, we concluded that "an authorization permitting search for items belonging to [the victim was] somewhat vague," but it "met minimal constitutional standards" because "the officers did not definitely know all of the circumstances surrounding [the victim's] disappearance although they were then in possession of sufficient facts to establish . . . that he was the victim of foul play and that appellant was involved." 452 N.W.2d at 674. In *Fawcett*, we similarly held that an authorization to submit the defendant's blood "to an approved lab for testing" met minimal constitutional standards for particularity because there was probable cause to believe evidence relevant to suspected criminal vehicular operation would be found, even though police did not know the type of intoxicant involved. 884 N.W.2d at 387. And in *Poole*, we concluded that an authorization to search "[c]omplete patient files of all females with dates of birth between January 1, 1965 and January 1, 1978 who saw [the appellant] from January 1, 1987 to the present for any kind of family practice services" was sufficiently particular because "the nature of the activity under investigation did not" give investigators complete knowledge of the extent of the appellant's criminal activities. 499 N.W.2d at 34.

In the above cases, we considered the circumstances of the case, the nature of the crimes under investigation, and whether a more precise description was possible based on the nature of the evidence sought. *See Miller*, 666 N.W.2d at 713. In other words, the

same warrant may be appropriately particular in one set of circumstances but inappropriately broad in another.

Although we have not yet applied the particularity requirement to a search of social media records like that at issue here, other courts have addressed similar situations. Those decisions suggest that a temporal limitation may make a warrant sufficiently particular, even if the authorized search is otherwise broad as to subject matter. In *Flores*, the United States Court of Appeals for the Ninth Circuit considered whether a warrant authorizing a search of a defendant's entire Facebook account, with no temporal limitation, violated the particularity requirement. 802 F.3d at 1045. The defendant was arrested for importing marijuana and, during a jail call, asked her cousin to delete information from her Facebook page. *Id.* at 1033. A warrant authorized a search of the defendant's Facebook account for evidence of the crimes of conspiracy and importation of a controlled substance. *Id.* at 1044. On appeal, the defendant argued that the warrant was overbroad because it contained no temporal limitation, and her Facebook account had been active for five to six years. *Id.* at 1045. Although the Ninth Circuit declined to decide whether the warrant was overbroad, it acknowledged that the warrant application "established probable cause to search [the defendant's] account for some time before her arrest." *Id.*

The Minnesota Court of Appeals recently came to a similar conclusion, holding that a warrant was sufficiently particular because it limited a search of a cell phone to data pertaining to the alleged crime and incorporated a temporal reference to the offense date. *State v. Simon*, No. A21-0370, 2022 WL 4295383, at *7 (Minn. App. Sept. 19, 2022). Likewise, the United States District Court for the District of Minnesota has held that a

22

warrant to search for "categories of information" on a defendant's Facebook account "for a specified, fairly narrow period of time close" to the alleged criminal activity was not overbroad. *United States v. Charles*, No. 16-065 (JNE/FLN), 2016 WL 5939333, at *3 (D. Minn. Oct. 12, 2016).

And just as courts have concluded that temporal limitations may save an otherwise overbroad search of electronic data, they have rejected sweeping warrants with no temporal limitation. For example, in *Blake*, the Eleventh Circuit addressed whether Facebook search warrants were unconstitutional "general" warrants in the context of a child-sex-trafficking investigation. 868 F.3d at 966, 974. The court stated that the Facebook warrants impermissibly authorized "general, exploratory rummaging" by requiring the disclosure "of virtually every kind of data that could be found in a social media account." *Id.* at 974.[4] This broad disclosure was unnecessary because "the warrants could have limited the request to messages sent to or from persons suspected at that time of being prostitutes or customers" and could have included a temporal limitation. *Id.* (noting that the warrants "should have requested data only from the period of time during which [the defendant] was suspected of taking part in the prostitution conspiracy").

We find the lines drawn by the above cases helpful and sensible, but remain mindful that the particularity requirement mandates a case-by-case examination. *See Miller*, 666 N.W.2d at 713. To determine whether the June warrant was sufficiently particular, we

---

[4] Ultimately, the *Blake* court did not need to decide whether the Facebook warrants violated the Fourth Amendment because the challenged evidence was otherwise admissible under the good-faith exception to the exclusionary rule. 868 F.3d at 974–75.

consider the circumstances of the case, the nature of the crimes alleged, and whether a more precise description was possible. *Id.* Although the challenged evidence ultimately incriminated Sardina-Padilla in the murder of Genis Cuate, the underlying warrant application alleged facts related to his role in the kidnapping and attempted murder of L.H. For this reason, our analysis focuses on the latter crime.[5]

To start, the record shows that investigators had probable cause to believe that evidence of L.H.'s kidnapping and attempted murder would be found on Sardina-Padilla's Facebook accounts for some amount of time before and after the alleged crimes. Given the grievous nature of the crimes under investigation, it was reasonable for investigators to believe that some degree of preparation and communication preceded the crimes. It was similarly reasonable for them to anticipate that a search of content produced for a period of time after the crime would yield relevant evidence. Because the investigators did not know the extent or timing of planning activities or relevant communication, they reasonably fashioned a limited request for content from roughly two months before the crime to two weeks after it.

Similarly, the circumstances justified the investigators' request for all content from the Facebook accounts within the designated timeframe. Sardina-Padilla discussed

---

[5] We acknowledge that evidence obtained within the scope of a lawfully issued and executed warrant may be used to investigate and prosecute suspected crimes beyond those which provided probable cause for the warrant. *Cf. State v. DeWald*, 463 N.W.2d 741, 747–48 (Minn. 1990) (holding that evidence that was not listed in a warrant pertaining to a separate homicide investigation was properly admitted under the plain view exception to the particularity requirement because its incriminating nature was immediately apparent when police executed that warrant).

24

deleting his Facebook accounts shortly after his arrest. Because there was no allegation that he discussed deleting specific content, officers could not reasonably identify specific types of content that would contain incriminating evidence. In addition, Sardina-Padilla was an alleged gang member who worked with Cortez Mendoza, another alleged gang member who admitted to kidnapping and shooting L.H. at Sardina-Padilla's direction. The warrant application alleged that the persons of interest and victim associated through Facebook. It also alleged that L.H. communicated with a third party about money that L.H. owed Sardina-Padilla for a gun—communications that the district court reasonably inferred took place over Facebook. These allegations suggested that Facebook content would yield evidence of Sardina-Padilla's motive in L.H.'s kidnapping and attempted murder, and of any planning that preceded the crimes. In sum, both the nature of the alleged crimes and the circumstances of the case reasonably prevented the investigators from giving a more precise description of the evidence sought.

We recognize that the June warrant's broad scope raises a close question. As the district court observed, a search warrant permitting police to seize "[a]ll content" associated with a social media account for a period of almost three months comes "perilously close to violating the requirement of particularity." But considering the circumstances of the case, the nature of the crimes under investigation, and whether the officers could have provided a more precise description of the evidence sought, we conclude that the June warrant was sufficiently particular. For this reason, the district court did not err in denying the motion to suppress evidence obtained pursuant to the June warrant.

25

Although we are mindful "that warrant affidavits are typically drafted by non-lawyers in the midst and haste of a criminal investigation," *Harris*, 589 N.W.2d at 791 (citation omitted) (internal quotation marks omitted), we remind officers to take care to tailor the scope of their request to the investigation at hand by establishing limitations on subject matter, timeframe, or other parameters. This case approaches the outer edge of the particularity requirement, and its outcome would likely differ under circumstances less favorable to the State.

III.

Finally, we address whether the district court abused its discretion by summarily denying Sardina-Padilla's petition for postconviction relief. That petition alleged that his trial counsel was ineffective for failing to challenge the location evidence obtained pursuant to the May warrant. We conclude that even if he could prove the facts alleged in his petition by a preponderance of the evidence, Sardina-Padilla would be entitled to no relief as a matter of law. This is because the facts alleged fail to establish a reasonable probability that the outcome of his trial would have been different but for his counsel's failure to challenge the May warrant. For this reason, the district court did not abuse its discretion by summarily denying his petition.

A person may petition for postconviction relief if a conviction violates their constitutional or statutory rights. Minn. Stat. § 590.01, subd. 1(1) (2022). A court must hold a hearing on a petition "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2022). We generally review a summary denial of postconviction relief for an abuse of

26

discretion. *Martin v. State*, 969 N.W.2d 361, 363 (Minn. 2022). But we review the denial of postconviction relief based on a claim of ineffective assistance of counsel de novo because such claims involve mixed questions of law and facts. *Opsahl v. State*, 677 N.W.2d 414, 420 (Minn. 2004). "Although doubts about whether to conduct an evidentiary hearing are resolved in favor of the petitioner," a district court need not hold a hearing "when the petitioner alleges facts that, if true, are legally insufficient to grant the requested relief." *Woodard v. State*, 994 N.W.2d 272, 276 (Minn. 2023) (citation omitted) (internal quotation marks omitted). Consequently, to be entitled to an evidentiary hearing on a claim of ineffective assistance of counsel, the appellant must "allege facts that, if proven by a fair preponderance of the evidence," would satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Chavez-Nelson v. State*, 948 N.W.2d 665, 671 (Minn. 2020) (citation omitted) (internal quotation marks omitted).

Under the *Strickland* test, the appellant must show (1) that "his counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors." *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013). If one prong is not met, we need not consider the other. *State v. Smith*, 932 N.W.2d 257, 271 (Minn. 2019).

Under the first, performance prong, "an objective standard of reasonableness" is described as "representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *Reed v. State*, 793 N.W.2d 725, 733 (Minn. 2010) (citations omitted) (internal quotation marks omitted). There is a presumption that counsel's performance was reasonable. *Id.* The

second, prejudice prong requires the appellant to show that a reasonable probability exists that the outcome of the proceedings would have been different but for counsel's alleged error. *Allwine v. State*, 994 N.W.2d 528, 536 (Minn. 2023). In analyzing the prejudice prong, we consider "the totality of the evidence before" the jury. *Hawes v. State*, 826 N.W.2d 775, 783 (Minn. 2013).

The district court summarily denied Sardina-Padilla's petition, concluding that, even if the facts alleged in his petition were proven by a preponderance of the evidence, he would not be entitled to relief because those facts fail to satisfy the prejudice prong of *Strickland*. Specifically, as part of its analysis the district court determined that, even if "the location data had been suppressed, there is little—if any—likelihood that the outcome of the trial would have been different."

Sardina-Padilla challenges the district court's analysis, claiming that the State could not have proven premeditation without the tracking evidence obtained pursuant to the May warrant because the manner of Genis Cuate's death does not imply premeditation. We disagree.

Minnesota Statutes section 609.18 (2022) defines "premeditation" as "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." We have previously held that premeditation "does not require proof of extensive planning or preparation, nor does it demand that a specific time period elapse for deliberation." *State v. Cox*, 884 N.W.2d 400, 412 (Minn. 2016). Premeditation can be formed during a brief pause in the hostile confrontation between the defendant and decedent. *See State v. Lloyd*, 345 N.W.2d 240, 246 (Minn. 1984). "[A]n inference of premeditation may be supported

by several categories of evidence, including planning activity, motive, the nature of the killing, and a defendant's actions following the killing." *State v. Thoresen*, 921 N.W.2d 547, 552 (Minn. 2019) (alteration in original) (citation omitted) (internal quotation marks omitted).

Cortez Mendoza testified that Sardina-Padilla paused his brutal beating of Genis Cuate—which had driven Genis Cuate to the point of yelling "kill me now"—to close the bedroom door. The motive for the murder is reflected in the Facebook video obtained from the June warrant,[6] which shows a person with Sardina-Padilla's distinctive wrist tattoo holding up Genis Cuate's seemingly lifeless body and stating, "See, see this guy, cop caller, for all you snitches, b**** a** n*****, all will suffer the same, all that s***, see, look at this s***." In describing the murder, the medical examiner testified that Genis Cuate suffered lacerations to his face and head consistent with blunt force injuries, but that he ultimately died by asphyxiated ligature strangulation—a cause of death that fractured his thyroid cartilage, caused petechial hemorrhaging, and left a ligature abrasion furrow around his neck. The examiner also testified that a victim of ligature strangulation would fall unconscious before dying, implying that Genis Cuate suffered a slow death.

Given this overwhelming evidence of premeditation, we conclude that there is no reasonable probability that the trial's outcome would have been different if counsel had

---

[6]     The validity of the May warrant has no bearing on the June warrant. Although the June warrant was issued after the May warrant, Sardina-Padilla does not argue that the application for the June warrant relied on evidence obtained pursuant to the May warrant. As explained above, the warrants were instead issued as part of separate criminal investigations.

successfully challenged the tracking data that placed Sardina-Padilla at the scene of the murder, and near the dirt road where Genis Cuate's body was found, on the night in question. We accordingly conclude that the district court did not abuse its discretion by summarily denying Sardina-Padilla's petition for postconviction relief.[7]

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment of conviction and summary denial of Sardina-Padilla's petition for postconviction relief.

Affirmed.

HENNESY, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

[7] Because we conclude that Sardina-Padilla's claim fails under the prejudice prong of the *Strickland* test, we need not address the performance prong.