*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1376**

State of Minnesota,
Respondent,

vs.

Justice King Whitelaw,
Appellant.

**Filed February 9, 2026
Affirmed
Bond, Judge**

Sherburne County District Court
File No. 71-CR-22-1032

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Dawn R. Nyhus, Sherburne County Attorney, George R. Kennedy, Assistant County Attorney, Elk River, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Laura G. Heinrich, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Larson, Presiding Judge; Connolly, Judge; and Bond, Judge.

**NONPRECEDENTIAL OPINION**

**BOND**, Judge

In this direct appeal from the judgment of conviction for theft, appellant argues that the evidence is insufficient to prove that he intentionally and without claim of right

withdrew $25,000 from his former partner's bank account and that the bank owned the funds. Alternatively, appellant argues that the district court abused its discretion by denying his petition for postconviction relief seeking a new trial based on ineffective assistance of counsel without an evidentiary hearing. Because the evidence is sufficient to sustain appellant's conviction and the district court did not abuse its discretion in denying appellant's postconviction petition, we affirm.

## FACTS

In August 2022, respondent State of Minnesota charged appellant Justice King Whitelaw with felony theft in violation of Minn. Stat. § 609.52, subd. 2(a)(1) (2020), for taking and retaining money from his former partner's bank account. The following evidence was received at Whitelaw's jury trial.

Whitelaw and J.W. began dating in December 2021. Soon after, Whitelaw moved into J.W.'s home and J.W. added Whitelaw to the deed of his house and the title of his car. In February 2022, J.W. added Whitelaw as a joint-account holder on J.W.'s Old National Bank checking account. On March 18, J.W. opened an account at Minnco Credit Union. When J.W. opened the Minnco account, he authorized Whitelaw to be a debit-card holder but did not make Whitelaw a joint-account holder because he wanted to limit Whitelaw's access to the money in the Minnco account. Shortly after opening the Minnco account, J.W. transferred $35,000 from the Old National account to the Minnco account.

On March 29, Whitelaw met with a Minnco employee to sign a member-services agreement giving Whitelaw debit-card-holder status. Whitelaw wanted to be added as an account holder, but the employee told him that J.W. had only authorized Whitelaw to be a

2

debit-card holder. The Minnco employee told Whitelaw that he had a $750 daily limit for ATM withdrawals and a $1,500 daily limit for point-of-sale transactions. The Minnco employee went over these restrictions three times and starred and circled these limitations on the member-services agreement, which Whitelaw signed. The employee testified that Whitelaw did not have any questions about the paperwork and, although Whitelaw was on his cellphone and appeared distracted during their meeting, he said, "[m]m-hmm, mm-hmm, yeah," indicating that he understood.

By April 8, J.W. and Whitelaw had ended their relationship. That day, Whitelaw withdrew the entire balance from the Old National account. Whitelaw then went to the Minnco drive-up window and asked a teller how much money he could withdraw from J.W.'s account. The teller asked Whitelaw to come inside the bank to process his request. Once inside, Whitelaw provided his identification and filled out a withdrawal slip requesting $25,000 in cash, for the purpose of buying a vehicle. The teller checked Minnco's online system and, finding no restrictions on Whitelaw's ability to withdraw funds from J.W.'s account, provided the cash to Whitelaw.

Later that day, J.W. received a text message from Whitelaw and a notification from Minnco of the withdrawal. J.W. testified that, in the text message, Whitelaw told him that "he feels half of everything is his and he's going to take it." When J.W. informed Minnco's branch manager that Whitelaw was not supposed to have access to that much money, the branch manager realized that Minnco's computer system erroneously listed Whitelaw as an authorized signer with no withdrawal limits on J.W.'s account. The branch manager called Whitelaw and requested that Whitelaw return the $25,000 to Minnco, explaining

3

that he was not entitled to the money because "[t]he cash withdrawal that you got from [Minnco] was not supposed to happen. You weren't authorized to be able to get that money." J.W. also called Whitelaw and told him that he needed to return the money. Whitelaw retained the money, refusing to return it to J.W. or Minnco. Minnco reimbursed J.W. $25,000 and the bank manager testified that, in so doing, Minnco "suffered the loss" of the $25,000.

The police investigator testified that, based on what he learned from J.W. and the branch manager, he believed Whitelaw "was aware that he took money he was not entitled to." The investigator also testified that, because Minnco reimbursed $25,000 to J.W., Minnco "became the victim[]" of the theft. The final jury instructions identified Minnco as the owner of the money Whitelaw allegedly took or retained.

The jury found Whitelaw guilty. The district court granted Whitelaw's motion for a downward dispositional departure and sentenced him to five years of probation with 19 months stayed and 120 days in jail. After Whitelaw filed a direct appeal, this court granted Whitelaw's motion to stay the appeal and remand to the district court for postconviction proceedings. On remand, Whitelaw filed a petition for postconviction relief, arguing he received ineffective assistance of counsel at trial. The district court denied Whitelaw's petition without an evidentiary hearing. This court then dissolved the stay and reinstated the appeal.

This appeal follows.

4

**DECISION**

**I.** **The evidence is sufficient to prove beyond a reasonable doubt that Whitelaw committed theft by taking or retaining the money in the Minnco account.**

Whitelaw argues that his conviction should be reversed because the state's evidence fails to prove beyond a reasonable doubt that he committed theft. In determining whether the evidence is sufficient to support a conviction, we "carefully examine the record to determine whether the facts and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Griffin*, 887 N.W.2d 257, 263 (Minn. 2016) (quotation omitted). We view the evidence in the light most favorable to the verdict and assume the fact-finder believed the state's witnesses and disbelieved contrary evidence. *Id.*

Due process requires the state to prove every element of a charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *State v. Merrill*, 428 N.W.2d 361, 366 (Minn. 1988); *see* U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. To convict Whitelaw of theft, the state was required to prove that he "intentionally and without claim of right [took], use[d], transfer[red], conceal[ed] or retain[ed] possession of movable property of another without the other's consent and with intent to deprive the owner permanently of possession of the property." Minn. Stat. § 609.52, subd. 2(a)(1). "'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(3) (2020). Additionally, "the actor must have

5

knowledge of those facts which are necessary to make the actor's conduct criminal and which are set forth after the word 'intentionally.'" *Id.*

When a defendant challenges the sufficiency of the evidence supporting a conviction, our standard of review depends on whether the state relied on direct or circumstantial evidence to prove the offense. *State v. Petersen*, 910 N.W.2d 1, 6 (Minn. 2018). Direct evidence is "evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *State v. Harris*, 895 N.W.2d 592, 599 (Minn. 2017) (quotation omitted). Circumstantial evidence is "evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." *Id.* (quotation omitted). "[C]ircumstantial evidence always requires an inferential step to prove a fact that is not required with direct evidence." *State v. Jones*, 4 N.W.3d 495, 501 (Minn. 2024) (quotation omitted).

Whitelaw challenges the sufficiency of the evidence on two elements. First, Whitelaw argues that the state failed to prove that he intentionally took or retained funds without a claim of right. *See* Minn. Stat. § 609.52, subd. 2(a)(1). The supreme court has defined "claim of right" to mean that a person has a reasonable belief of license or permission. *See State v. Brechon*, 352 N.W.2d 745, 748 (Minn. 1984) (analyzing meaning of "claim of right" in trespass statute); *State v. Cubbage*, No. A04-1411, 2005 WL 468640, at *3 (Minn. App. Mar. 1, 2005) (applying *Brechon*'s claim-of-right analysis to theft

statute), *rev. denied* (Minn. May 25, 2005).[1]  "If the defendant has a claim of right, he lacks the criminal intent which is the gravamen of the offense."  *Brechon*, 352 N.W.2d at 749.

"Because intent involves a state of mind, it is generally established circumstantially."  *State v. Pederson*, 840 N.W.2d 433, 436 (Minn. App. 2013); *see also State v. Clark*, 739 N.W.2d 412, 422 (Minn. 2007) (stating that a defendant's state of mind is "generally proved circumstantially—by drawing inferences from the defendant's words and actions in light of the totality of the circumstances" (quotation omitted)).  We agree with the parties that the circumstantial-evidence standard of review applies to the sufficiency of the evidence that Whitelaw acted intentionally and without claim of right.

Second, Whitelaw argues that the state failed to prove that Minnco was the "owner" of the money that Whitelaw took or retained from J.W.'s account.  *See* Minn. Stat. § 609.52, subd. 2(a)(1).  The parties dispute the standard that applies to our review of the evidence proving the "ownership" element.  We assume without deciding that this element relies on circumstantial evidence and, accordingly, apply the circumstantial-evidence standard of review to both contested elements.

Under the circumstantial-evidence standard of review, we first identify the circumstances proved, "defer[ring] to the [fact-finder's] acceptance of the proof of [the] circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State."  *State v. Silvernail*, 831 N.W.2d 594, 598-99 (Minn. 2013) (quotation omitted).  This means that "we consider only those circumstances that are consistent with

---

[1] We cite nonprecedential opinions for their persuasive value.  *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).

the verdict." *Id.* at 599. Next, we independently determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt, giving "no deference to the fact finder's choice between reasonable inferences." *Id.* (quotation omitted). "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted). When evaluating the inferences that may be drawn from the circumstances proved, reviewing courts do not "analyze and parse each fact in a piecemeal fashion to conclude that a hypothesis is reasonable" and may not set aside a verdict based on speculation. *State v. Colgrove*, 996 N.W.2d 145, 150 (Minn. 2023) (quotation omitted).

**Intentionally and Without Claim of Right**

Viewing the evidence in the light most favorable to the verdict, the circumstances proved relevant to whether Whitelaw knew he lacked a claim of right to take or retain the money from the Minnco account are as follows. Shortly after J.W. and Whitelaw began dating, J.W. added Whitelaw to the deed of his house and to the title of his car, and made Whitelaw a joint-account holder of his Old National Bank account. In March 2022, J.W. opened an individual bank account at Minnco and made Whitelaw a debit-card holder on the account. When Whitelaw signed a member-services agreement giving him debit-card-holder status on the Minnco account, the Minnco employee told him that, as a debit-card holder, Whitelaw had a daily ATM withdrawal limit of $750 and a daily point-of-sale limit of $1,500. The employee starred and circled these restrictions on the member-services

8

agreement, which Whitelaw signed. Whitelaw was distracted and on his phone during the meeting but also gave the teller verbal cues he understood what she was saying, such as saying, "[m]m-hmm, mm-hmm, yeah."

In late March, J.W. moved a large sum of money from his Old National Bank account, an account to which Whitelaw had unlimited access, to the Minnco account. On April 8, after the relationship had ended, Whitelaw emptied the Old National Bank account. That same day, Whitelaw went to the Minnco drive-through window and asked the teller how much money he could withdraw through the window. After being directed to come into the bank, Whitelaw provided his identification, filled out a withdrawal slip, and requested $25,000 in cash for the purpose of buying a vehicle. Because of a computer error, Minnco's online system did not show any restrictions on Whitelaw's ability to take funds out of J.W.'s account and the teller gave Whitelaw $25,000 in cash. Later, the branch manager asked Whitelaw to return the money, telling him he was not "authorized to be able to get that money." J.W. also called Whitelaw and asked him to return the money. Whitelaw did not return the money.

We conclude that, viewed as a whole, the circumstances proved are consistent with the rational hypothesis that Whitelaw took or retained the money in the Minnco account intentionally and without a claim of right and inconsistent with any rational hypothesis other than guilt. Whitelaw argues that the circumstances proved support a reasonable inference that, although he knew he had ATM and point-of-sale limitations, he did not know he was limited in the amount he could withdraw at the bank. Whitelaw points out that he was a joint-account holder on the Old National account, which had no withdrawal

9

restrictions, and he was on the deed to the house and the title to the car. Whitelaw also asserts that his retention of the money after the branch manager and J.W. asked him to return it "does not turn his conduct into a knowing criminal act" because the branch manager did not explain why Whitelaw needed to return the money and Minnco "never sent a demand letter" to Whitelaw.

In determining the reasonableness of inferences, we must consider the circumstances proved not in isolation, but as a whole. *Colgrove*, 996 N.W.2d at 150; *Harris*, 895 N.W.2d at 600. Whitelaw's alternate hypothesis is not reasonable in light of the circumstances proved as a whole. The circumstances proved include that, before April 8, J.W. took steps to limit Whitelaw's access to his finances by moving money from the Old National account to the Minnco account, an individual account where Whitelaw was a debit-card holder rather than a joint-account holder. The bank had informed Whitelaw about his limited debit-card-holder status and withdrawal limits. Significantly, when Whitelaw withdrew $25,000 from J.W.'s Minnco account, Whitelaw and J.W. were no longer in a relationship. Immediately before withdrawing money from the Minnco account, Whitelaw withdrew all the money from J.W.'s Old National Bank account. Whitelaw refused to return the money he took from the Minnco account, even after being told by Minnco and J.W. that the cash withdrawal he received "was not supposed to happen" because he "[wasn't] authorized to be able to get that money." These circumstances proved are inconsistent with any reasonable inference that Whitelaw believed he had a claim of right to retain the money he took from the Minnco account.

Viewed in their entirety, the circumstances proved are consistent with the rational hypothesis that Whitelaw took or retained the money in the Minnco account intentionally and without a claim of right and inconsistent with any rational hypothesis other than guilt.

**Ownership**

Whitelaw challenges the sufficiency of the evidence on a second element, arguing that the state failed to prove that Minnco, the identified victim, owned the money he took or retained. *See* Minn. Stat. § 609.52, subd. 2(a)(1). The state argues that, although "the money Whitelaw withdrew from J.W.'s account belonged to J.W., [Whitelaw] ended up retaining money that belonged to Minnco Credit Union after it reimbursed J.W. and told Whitelaw to return the money."

The relevant circumstances proved are that J.W. was the account holder of the Minnco account and Whitelaw had debit-card-holder status. Whitelaw took $25,000 from J.W.'s Minnco account on April 8. Both Minnco and J.W. informed Whitelaw that he did not have authority to take that amount of money and told Whitelaw to return the money. Whitelaw refused to return the money and Minnco later reimbursed J.W. $25,000. The investigating officer testified that, by reimbursing J.W., Minnco became the victim of the theft and the bank manager testified that Minnco ultimately "suffered the loss" of the $25,000.

Viewed as a whole, the circumstances proved are consistent with the rational hypothesis that Whitelaw took or retained money owned by Minnco and inconsistent with any rational hypothesis other than guilt. Whitelaw emphasizes that J.W. was the owner of the Minnco account when Whitelaw withdrew the money on April 8. But the theft statute

11

prohibits taking *or retaining* property of another intentionally and without claim of right "with intent to deprive the owner permanently of possession of the property." Minn. Stat. § 609.52, subd. 2(a)(1). While Whitelaw attacks the branch manager's testimony that Minnco became the victim when it reimbursed J.W. as a "conclusion" that fails to explain "why Minnco was the owner of the funds when it was J.W.'s account," the absence of evidence is not a circumstance proved. *State v. German*, 929 N.W.2d 466, 473-74 (Minn. App. 2019). Whitelaw fails to point to any circumstance proved supporting an inference that Minnco, having become the victim of the theft upon reimbursing J.W. the $25,000 Whitelaw took from the account, was not the owner of the money that Whitelaw retained. *See State v. Andersen*, 784 N.W.2d 320, 330 (Minn. 2010) (stating that a reviewing court "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture" (quotation omitted)); *Al-Naseer*, 788 N.W.2d at 480 (stating that a theory is not "conjecture or speculation" when a defendant "points to evidence in the record that is consistent with a rational theory other than guilt" (quotation omitted)). Accordingly, the circumstances proved are consistent with the rational hypothesis that Minnco owned the money that Whitelaw took or retained and inconsistent with any rational hypothesis other than guilt.

Therefore, the evidence is sufficient to sustain Whitelaw's theft conviction.

## II. The district court did not abuse its discretion in denying Whitelaw's postconviction petition without a hearing.

Whitelaw contends that the district court erred in summarily denying his postconviction petition, arguing that he alleged sufficient facts to show that he received

12

ineffective assistance of counsel based on his trial counsel's failure to investigate the impact Whitelaw's alleged traumatic brain injury (TBI) had on his ability to understand that he was not entitled to take or retain the money in the Minnco account. We generally review a denial of a petition for postconviction relief without an evidentiary hearing for an abuse of discretion. *State v. Nicks*, 831 N.W. 2d 493, 503 (Minn. 2013). But we "review the denial of postconviction relief based on a claim of ineffective assistance of counsel de novo because such claims involve mixed questions of law and facts." *State v. Sardina-Padilla*, 7 N.W.3d 585, 602 (Minn. 2024).

A person may petition for postconviction relief if a conviction violates their constitutional or statutory rights. Minn. Stat. § 590.01, subd. 1(1) (2024). A postconviction petitioner is entitled to a hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2024). A district court must consider the facts alleged in the petition as true and construe them in the light most favorable to the petitioner. *Andersen v. State*, 913 N.W.2d 417, 424 (Minn. 2018). "Although doubts about whether to conduct an evidentiary hearing are resolved in favor of the petitioner, a district court need not hold a hearing when the petitioner alleges facts that, if true, are legally insufficient to grant the requested relief." *Sardina-Padilla*, 7 N.W.3d at 602-03 (quotations omitted).

The right to effective assistance of counsel is guaranteed to all criminal defendants by the United States and Minnesota Constitutions. U.S. Const. amend. VI; Minn. Const. art. I, § 6; *Taylor v. State*, 887 N.W.2d 821, 823 (Minn. 2016). To be entitled to an evidentiary hearing on a postconviction claim of ineffective assistance of trial counsel, the

petitioner "must allege facts that, if proven by a fair preponderance of the evidence, would satisfy the two-prong test" articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Chavez-Nelson v. State*, 948 N.W.2d 665, 671 (Minn. 2020) (quotation omitted). Under *Strickland*, a petitioner must show that: (1) counsel's representation "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quotations omitted). "The reviewing court considers the totality of the evidence . . . in making this determination[, and] need not address both the performance and prejudice prongs if one is determinative." *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003) (citation omitted).

We conclude that, even if Whitelaw proved the facts alleged in his petition by a preponderance of the evidence, he would not be entitled to relief as a matter of law because the facts alleged fail to establish a reasonable probability that the outcome of his trial would have been different but for his counsel's failure to investigate his TBI. First, as the district court found, if Whitelaw's trial counsel had sought to admit evidence that Whitelaw's TBI negated his intent, the district court likely would have properly excluded the evidence as a diminished-capacity defense. *See State v. Anderson*, 789 N.W.2d 227, 237 (Minn. 2010) ("Minnesota does not recognize the doctrine of diminished capacity or diminished responsibility."); *see also State v. Engel*, 18 N.W.3d 540, 554 (Minn. App. 2025) (affirming the district court's exclusion of expert testimony "that the symptoms [defendant] experienced on the date of the incident were consistent with his PTSD diagnosis and related to his prior trauma responses" because such testimony would "lead the jury to consider

14

whether [defendant] had diminished capacity, which is not a defense recognized in Minnesota"), *rev. granted* (Minn. June 17, 2025).

Second, Whitelaw's claim focuses on his ability to comprehend "in the moment when he was distracted" during the March 29 Minnco meeting and he argues that evidence of Whitelaw's TBI "related to the element that the state had to prove—whether [Whitelaw] knew he did not have a claim of right to the funds he withdrew." But the jury heard evidence that Whitelaw was distracted and not paying attention when the Minnco employee explained during the March 29 meeting that he was a debit-card holder, not a joint-account holder, and Whitelaw's trial counsel highlighted this evidence during closing argument.

Third, as we have explained, the theft statute criminalizes the intentional taking *or retaining* of property without claim of right. Minn. Stat. § 609.52, subd. 2(a)(1). The evidence at trial showed that Whitelaw retained the $25,000 he took from J.W.'s Minnco account even after being told by J.W. and by Minnco that he was not authorized to withdraw the money and needed to return it. Whitelaw's postconviction petition does not allege that the effects of a TBI impeded his ability to understand J.W. and Minnco when they told him that he had improperly received the money due to the bank's computer error, he was not entitled to retain the money, and he needed to return it.

Because Whitelaw fails to establish that there is a reasonable probability that the outcome of his trial would have been different but for his counsel's failure to investigate his TBI, the district court did not abuse its discretion by summarily denying his petition. *See Sardina-Padilla*, 7 N.W.3d at 602.

**Affirmed.**

15